

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARL SMITH, deceased, by and through )
LAVERNE SMITH, his next best friend )
and Administrator of the Estate of )
Carl Smith, )
)
        Plaintiff, )
)
vs. )   No. 05 C 1264
)
MICHAEL F. SHEAHAN, et al., )
)
        Defendants. )

## MEMORANDUM OPINION AND ORDER

This case arises out of the death of Carl Smith, while he was in the custody of the Cook County Department of Corrections. Plaintiff Laverne Smith, as Smith's wife and administrator of his estate, brings this suit under 42 U.S.C. § 1983; Illinois common law; the Illinois Wrongful Death Act, 740 ILCS 180/1 (2005); and the Illinois Survival Act, 735 ILCS 5/27-6 (2005). She names as defendants Michael Sheahan, in his capacity as Sheriff of Cook County, and Cook County, doing business as Cermak Health Services[1], along with six individual employees of Cermak Health Services: Dr. Andrew Ting, Dr. Mohamed Mansour, Physician Assistants Barbara Davis and Tiffany Delane, Nurse Kathleen Watson and Nurse Rose McBride. All defendants move for summary judgment. Plaintiff moves for summary judgment of liability against the County. Defendants also move to strike as inadmissible two

---

[1] When a plaintiff sues a government employee in his official capacity, the suit is treated as if the plaintiff has sued the municipality itself. Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 765 (7th Cir. 2006). Defendant Cermak Health Services is a division of the Cook County Bureau of Health that subcontracts to provide medical care to detainees in the custody of the Cook County Jail. For purposes of clarity we refer to both defendants as "the County."

letters written by Carl Smith before he died. For the following reasons, defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's motion for summary judgment is denied. Further, defendants motion to strike is granted.

## BACKGROUND

### 1. The Policy

As part of its contract with the County, Cermak Health Services maintains a pharmacy on the grounds of the Cook County Jail. Drugs that are regularly kept in stock at the pharmacy are categorized as "formulary," and will be dispensed with a proper prescription. Drugs that are not kept in regular stock at the pharmacy are categorized as "non-formulary."

At the time Smith was incarcerated at the jail, the County had a policy in effect to govern prescriptions for non-formulary medications. The policy provided in relevant part that:

> A. When a pharmacist receives a request for a non-formulary item, the pharmacist will call the prescribing physician and inquire whether an alternative product can be substituted . . . . If a substitute drug is unavailable and the drug is urgently needed, the pharmacist will immediately attempt to acquire the product.
>
> B. All written requests must be sent on an original non-formulary form, with the prescription order attached, and then forwarded to the pharmacy as soon as possible.
>
> C. All the information requested on the form must be supplied by the requesting physician including a complete statement (justification) as to why an existing formulary item is not suitable. Pharmacy personnel will attempt to contact the requesting physician for any missing information.

### 2. Smith's History and Incarceration

The underlying facts in this case are not in dispute. Carl Smith received a liver transplant on January 4, 2004, as treatment for Hepatitis-C and cirrhosis of the liver. As part of his post-operative care, Smith was prescribed medication to prevent his body from rejecting

the new liver. Relevant to this case are two of those medications: Cyclosporine, in the form of Gengraf, and CellCept. Smith was prescribed two doses of each drug daily, one in the morning and one in the evening. He responded well to the transplant and as late as June 1, 2004, Dr. Scott Cotler[2] found, upon examination, that Smith had good liver function.

On August 3, 2004, the Chicago police arrested Smith and charged him with attempted residential burglary. On that same day, the police took Smith to Resurrection Hospital. At the hospital Smith received his anti-rejection medications. At some point on August 4, 2004, Smith was transferred to the custody of the Cook County Jail. He was processed through, receiving classification at the jail, and underwent both a security and medical screening. Defendant Delane administered Smith's health assessment, which shows his "status post liver transplant, 1-04, secondary to cirrhosis, Secondary to Hep C, [hypertension]." The form also indicates that he had no acute complaints on August 4, 2004, and lists the medications that he was taking.

At the time of the intake, Delane determined that Smith was medically stable and could be sent to the Residential Treatment Unit (RTU). She wrote Smith a prescription for all of his medications, including Gengraf, which is classified as non-formulary, and CellCept, which it appears from the record is classified as formulary. She later testified that she was probably aware that Gengraf was non-formulary and would have prepared a non-formulary drug request form (Delane dep. Aug. 6, 2007, at 68-70). Dr. Mansour was the doctor on duty at the time of Smith's intake; he did not examine Smith, but he reviewed and co-signed Smith's initial intake prescription form. Dr. Mansour also testified that he assumed Gengraf was not formulary when he prescribed it (Mansour Dep. July 17, 2006 at 45).

---

[2] Dr. Cotler managed plaintiffs post-transplant care. At that time he was the chief of hepatology and medical director of transplant medicine at the University of Illinois Digestive Disease and Liver Clinic.

Although the medication was prescribed for Smith at his intake, his medical records show that he received no actual medication on August 4, 2004. The next morning, August 5, Smith received his first dose of CellCept, but did not receive Gengraf. That evening he received neither CellCept or Gengraf. Smith also did not receive any doses of Gengraf or CellCept on August 6.

On August 6, 2004, a nurse spoke to Davis to make sure that Smith was receiving the correct medication. Davis called Dr. Cotler, who instructed her to change Smith's prescription for Gengraf to a prescription for the formulary drug, Sandimmune. Davis wrote a new prescription for Sandimmune that day. But it was not until August 7 that Smith received the medication in the new prescription. On that day he received both the prescribed morning and evening doses of CellCept and Sandimmune. Smith then continued to receive the prescribed doses of medication, but only sporadically, for the duration of his incarceration at the jail.

On August 10, 2004, Smith passed out in a courtroom lock-up and was transported to the Resurrection Hospital emergency room. He was stabilized and returned to the jail. On August 12, 2004, Smith, complaining of severe abdominal pain, was brought to the emergency room at the jail. Dr. Ting, the doctor on duty, ordered Smith's immediate transfer to the Provident Hospital Emergency Room. The next day, Smith was transferred from Provident Hospital to the University of Illinois Hospital to undergo a liver biopsy. Dr. Cotler examined the results of the biopsy and found them to be "consistent with acute rejection." A second biopsy was performed on August 20, 2004. Dr. Cotler examined the results of that biopsy and noted the reactivation of Hepatitis-C. Shortly after the second biopsy Smith was informed that his condition was terminal and he was transferred to hospice care at Oak Forest Hospital. Smith died on January 13, 2005.

## ANALYSIS

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is not appropriate "[i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We may not make credibility determinations, weigh evidence, or decide which inferences to draw from the facts. *Id.* at 255. Where, as here, the parties file cross motions for summary judgment, each party must still demonstrate that there are no genuine issues of material fact. *See* Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voight, 700 F.2d 341, 349 (7th Cir. 1983). We are not obligated to grant summary judgment for one side. *Id.* We must evaluate each party's motion on its own merits, resolving all factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003).

The Eighth Amendment protects convicted prisoners from deliberate indifference to a serious injury or medical need. Estelle v. Gamble, 428 U.S. 97, 104 (1976). That right is extended to pre-trial detainees, such as Smith, by the Due Process Clause of the Fourteenth Amendment. Williams v. Rodriguez, 509 F.3d 392, 401 (7th Cir. 2007). To demonstrate deliberate indifference, plaintiff must show two things: 1) that the potential harm to Smith was objectively serious; and 2) that defendants were deliberately indifferent to his health or safety by failing to take reasonable measures to abate the risk. *See* Davis v. Carter, 452 F.3d 686, 695-96 (7th Cir. 2006). Defendants concede that Smith, as a transplant patient, had a condition that left him susceptible to serious harm, so we focus our analysis only on whether

defendants were deliberately indifferent.

The Seventh Circuit has held "that deliberate indifference requires a showing of more than mere negligence (or even gross negligence) but less than purposeful infliction of harm." Woodward v. Correctional Medical Services of Ill., Inc., 368 F.3d 917, 926 (7th Cir. 2004) (citations omitted). "A detainee establishes a §1983 claim by demonstrating that the defendants were aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger." Payne for Hicks v. Churchich, 161 F.3d 1030, 1041 (7th Cir. 1998). Although this is a "high hurdle for a plaintiff," Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002), he "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 842 (1994).

1. Constitutional Claims

    A. The County

A municipality violates a detainee's rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." Woodward, 368 F.3d at 927. "This liability is not founded on a theory of vicarious liability or *respondeat superior* that holds a municipality responsible for the misdeeds of its employees. Rather, a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation." *Id.* (citations omitted). In other words, "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* (citations omitted).

A plaintiff may establish municipal liability by any of three methods: "1) through an

express policy that, when enforced, causes a constitutional deprivation; 2) through a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or 3) through an allegation that the constitutional injury was caused by a person with final policymaking authority." Calhoun v. Ramsey, 408 F.3d 375, 379 (7th Cir. 2005) (internal quotations omitted). Defendants contend that plaintiff is not entirely clear regarding which method she intends to employ. This is not so. Plaintiff complains about omissions in the express policy of the County concerning non-formulary drug requests. Defendants' confusion apparently stems from the requirement that when a plaintiff argues deficiencies in an express policy (as we believe this plaintiff does), she must ultimately demonstrate the same thing as if she was arguing that the County has an implicit policy of denying detainees non-formulary medication, namely, that there is a true municipal policy at issue, not a single random event. *See* Calhoun, 408 F.3d at 380-81. This most commonly entails showing a pattern of violations. *Id.*

Plaintiff argues that summary judgment on liability is appropriate for three reasons: 1) the non-formulary drug request policy does not identify a specific person or persons to complete the steps required to obtain a non-formulary medication, 2) the policy does not specify any time frame within which the non-formulary drug is to be obtained and administered to an inmate, and 3) the policy does not designate anyone to follow up and ensure that the non-formulary drugs are administered. She argues that these three deficiencies are similar to the deficiencies in the Cook County Jail's methadone distribution policy, which the Seventh Circuit addressed in Davis v. Carter, 452 F.3d 686 (7th Cir. 2006).

In Davis, a widow brought suit on behalf of her husband's estate against, among others,

Cook County, and alleged that the County had a widespread custom or practice of failing to provide timely methadone treatment. But plaintiff mischaracterizes the court's holding in Davis when she contends that the Seventh Circuit "found that the deficiencies in the Cermak methadone policy resulted in a 'widespread practice or custom of inordinate delay in providing methadone treatment to inmates.'" (Plf's mot. at 8.) The Davis court did not determine whether or not the methadone policy was constitutional. The court held only that the plaintiff had presented enough evidence to show a disputed issue of material fact as to whether the County had a widespread practice of failing to provide timely methadone treatment and, therefore, summary judgment for the County was inappropriate. The court remanded the case for trial so that a jury could make the factual determination of whether there were routinely several days' delay in providing methadone treatment or whether, as the County argued, any delays were isolated and due to factors outside of its control.

Plaintiff argues that we are faced with a similar question here, but that she is entitled to summary judgment because, in addition to the similarities in the two policies, the defendants in this case have admitted that the non-formulary drug request policy does not provide any time-frame within which a non-formulary medication must be acquired or received by an inmate. According to plaintiff, this admission, coupled with evidence that delays of several days in the receipt of critical drugs is not uncommon, is an acknowledgment of an unconstitutional policy. We disagree. The evidence of delay in this case is disputed, and so, like Davis, summary judgment is inappropriate.

Plaintiff relies on the testimony of Maryann Wrobel, the Cermak assistant pharmacy director, and defendant McBride, to support her argument. Wrobel testified that under the non-formulary policy a delay in obtaining non-formulary drugs, including urgently needed

medications, can take "a day or two" (Wrobel dep. July 12, 2007, at 63). But "a day or two" is different than "several days." McBride's testimony that it may take "two or three days" for a detainee to receive non-formulary medication (McBride dep, Oct. 24, 2006, at 99), strengthens plaintiff's argument, but it is hardly conclusive proof of a widespread practice. Further, Wrobel also testifies that non-formulary medications were usually obtained by the pharmacy on the day of the request (Wrobel dep, July 12, 2007, at 60-61).[3] How to resolve this disputed testimony and answer the question of whether there was a widespread practice of delay in receiving non-formulary medications is a job for the fact-finder, and not for the court on summary judgment.

Plaintiff's motion suffers from a second fatal flaw. In order to warrant a finding of summary judgment on liability in favor of plaintiff, she must also demonstrate that the non-formulary drug request policy caused Smith's injury. *See* Langston v. Peters, 100 F.3d 1235, 1240-41 (7th Cir. 1996) (holding that verifying medical evidence must exist to show how a delay in treatment adversely affected patient's condition). As we read plaintiff's complaint, she alleges that Smith suffered two injuries: the pain and suffering that accompanied liver rejection while he was ill and his subsequent death. (Pl.'s 2d Am. Compl. at ¶¶ 25, 33.) There is evidence that Smith was in pain prior to his death. On August 10, 2004, after passing out in the court lock-up, Smith was taken to the Resurrection Hospital Emergency complaining of abdominal pain. (*See* Pl.'s Ex. M at 1011.) On August 12, 2004, Smith had to be transported "via cart" to the Cermak emergency room because he was lethargic and suffering from severe abdominal pain. (*See* Pl.'s Ex. L at 592.) But the crux of Eighth Amendment causation analysis here is what caused the underlying illness.

---

[3] In their brief, defendants incorrectly attribute this testimony to defendant Davis.

Plaintiff contends that there is no genuine question of fact that Smith became ill because he did not receive his medications. This is a logical leap that is too great to make at the summary judgment stage. Defendants have presented evidence that Smith's illness and death were not a result of liver rejection. His death certificate lists Hepatitis-C and cirrhosis of the liver as the causes of his death, and the autopsy performed on Smith's body indicated that the cause of death was cirrhosis and necrosis of the liver, due to Hepatitis-C infection. To counter this evidence plaintiff has presented Dr. Cotler's opinion that the results of the autopsy are not mutually exclusive with liver failure. That may be true, but the question of whether rejection or Hepatitis C caused Smith's illness and subsequent death is far from settled, and as such it is a question for the jury. We deny plaintiff's motion for summary judgment.

Defendants' argument in favor of summary judgment is twofold. First, defendants assert plaintiff cannot show that the non-formulary drug request policy suffers from omissions because the omissions she complains of do not exist. As support, they rely on the plain language of the policy, which instructs pharmacists to "immediately attempt to acquire" non-formulary medications if a substitute drug is unavailable and there is an urgent need, and further requires that written requests for non-formulary medications be "forwarded to the pharmacy as soon as possible." In the defendants' view, this demonstrates the intent of policy-makers to ensure that inmates receive non-formulary medications as soon as is reasonably practical, and such intent meets the Eighth Amendment's requirement that inmates receive "basic medical care." *See* Estelle v. Gamble, 429 U.S. 97, 104 (1976). *See also* Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997) (explaining that inmates are "not entitled to the best care possible . . . [only] to reasonable measures to meet a substantial risk of serious harm"). Also, defendants rely on the expert report of Dr. Joel Goldstein, who opines that the policy is

adequate to supply non-formulary medication in a timely manner.

Plaintiff responds that the quoted language in the policy is not specific enough to ensure that detainees receive their required medications. The phrase "immediately attempt to acquire" explains when a pharmacist is to attempt to obtain non-formulary medication, and the phrase "as soon as possible" refers to the time-frame in which a non-formulary drug request form is to be forwarded to the pharmacy from intake. The policy contains no time limit within which medication is to be administered to the patient, or any back-stop mechanism to prevent detainees in urgent need of medication from going without that medication for long periods of time while waiting approval. More importantly for our present purpose, as we discussed above, plaintiff has presented evidence in the form of testimony from Maryann Wrobel and McBride that this policy can result in a delay in detainees receiving their non-formulary medications of anywhere from one to several days. The testimony is not conclusive, but we are now examining defendant's motion and so we must draw all inferences in favor of plaintiff. A reasonable jury could find in favor of plaintiff, and so summary judgment is not appropriate.

Defendants also argue that even if the policy results in a widespread practice of delay, summary judgment is appropriate because the single incident of Smith's death is not sufficient to put the County on notice for deliberate indifference to constitutional violations for transplant inmates, and plaintiff has provided no evidence that similarly situated transplant patient inmates failed to receive necessary medication. But the Seventh Circuit has already rejected this argument. In <u>Davis</u>, the court held that there was a difference between showing repeated past bad acts and repeated past injuries:

> To establish a widespread custom or policy, the plaintiff here was not required to show that Cook County's alleged repeated pattern of delay (i.e., its alleged

> past "bad acts") actually caused pain and suffering to other inmates in need of medical intervention (i.e., repeated past injuries). Instead, it was enough to provide competent evidence tending to show that Cook County routinely failed to provide methadone to inmates for several days."

Davis, 452 F.3d at 695. *See also* Woodward, 368 F.3d at 929 (holding that "the plaintiff's failure to introduce evidence of any suicide at the Lake County jail besides [the plaintiff]" did not "doom[] plaintiff's efforts to prove a custom or practice." "[Defendant] does not get a 'one free suicide' pass"); Estate of Moreland v. Dieter, 395 F.3d 747, 760-61 (7th Cir. 2005) (citing Woodward for the proposition that "the plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."). If plaintiff can demonstrate evidence of a widespread practice of delay, she does not need to show that anyone besides Smith died because of the policy. We deny defendants' motion for summary judgment as to the County.

### B. The Individual Defendants

As we have previously recounted, defendants concede that the danger to Smith was objectively serious. In order to survive summary judgment then, plaintiff must present viable evidence that defendants were subjectively aware of the substantial risk of serious harm to Smith and disregarded it. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In other words, that means evidence that shows that the individual defendants were "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists," and that the individual defendants drew the inference. *Id.* Plaintiff need not prove that the individual defendants were "exposed to information concerning the risk," because "actual knowledge of a substantial risk of serious harm can be inferred by the trier of fact from the obviousness of the risk." Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 260 (7th Cir. 1996).

Dr. Ting was on vacation when Smith was transferred to the custody of the jail. He returned from vacation on August 11, 2004. Plaintiff's main argument regarding Dr. Ting

appears to be that he did not arrange for another physician to cover his duties while he was on vacation, and that upon his return he did not immediately examine Smith, review his records, or order any medical tests, which in turn placed Smith in serious harm. Dr. Ting testified that it was not his responsibility to find coverage for his vacations. Rather, that was the responsibility of the County. Plaintiff has produced no evidence to rebut this.[4] Further, on August 12, 2004, when Smith became ill, Dr. Ting examined him and signed an emergency order transferring him to Provident Hospital. Plaintiff has proffered no evidence that Dr. Ting was aware of Smith's presence, let alone his condition, before he encountered him in the emergency room on August 12. Based on these facts, no reasonable jury could find that Dr. Ting was deliberately indifferent to Smith's medical needs. We grant summary judgment for defendant Dr. Ting.

There are, however, disputed issues of material fact as to whether the remaining defendants were deliberately indifferent. All of the remaining defendants were alerted to Smith's status as a liver transplant recipient by his medical records. At Smith's intake interview, Dr. Mansour and Delane co-signed prescriptions for Gengraf, a drug that they were "probably" aware or "assumed" was non-formulary. They did not attempt to locate the drug or a suitable substitute during the admission process, even though Smith had not received his prescription that day. Further, neither followed-up with Smith over the next two days in order to determine whether he had begun receiving Gengraf or a substitute, despite "probably" being aware or "assuming" that Gengraf was non-formulary and therefore not in stock at the pharmacy. A reasonable jury could conclude that Dr. Mansour and Delane, as trained medical professionals, were aware of the risk to Smith if he failed to receive his

---

[4] Indeed we note that Dr. Mansour provided coverage for the RTU in Dr. Ting's absence.

anti-rejection medications and recklessly disregarded that risk.

Davis was alerted by a nurse on August 6, 2004, that Smith might not be receiving his medication. She contacted Smith's physician, Dr. Cotler, who instructed her to change Smith's non-formulary Gengraf to formulary Sandimmune. That day she re-wrote Smith's prescriptions to reflect the change. Defendants contend that is enough to show that she was not deliberately indifferent to Smith's medical needs. Plaintiff asserts that because Smith's medical records showed that he had not received any anti-rejection medications on August 4, 5, or 6, Davis should have checked plaintiff's cyclosporine levels and taken steps to ensure that he received his medication as soon as possible on August 6, rather than waiting until August 7. The question here is close, but drawing all inferences in favor of the plaintiff, we find that summary judgment is not appropriate. Smith's medical record showed that he had received no Gengraf on August 4, 5, or 6, and only one dose of CellCept over the same three days. A reasonable jury could conclude that Davis recklessly disregarded the risk to Smith from failing to receive his anti-rejection medication by not making sure that he received a dose of the new prescription on August 6, rather than waiting until the next morning.

Defendants admit that nurses employed at the jail monitor and care for the inmates in the RTU, maintain medical records, and administer prescriptions. Watson and McBride reviewed and signed off on Smith's medication records, documenting what medication he was prescribed and what medication he received. Smith's medical records show that his prescriptions for anti-rejection medication were not filled on numerous occasions. Defendant argues that plaintiff cannot show deliberate indifference because both nurses testified that they were unaware at the time that failure to receive a dosage of anti-rejection medication could have a detrimental effect on a transplant recipient. But plaintiff did not miss "a

dosage" of his anti-rejection medication. He received no Gengraf on August 4, 5, or 6. In that time period he received only one dose of CellCept. He missed further doses of both medications on the morning of August 8, the evening of August 9, the evening of August 10, and the morning of August 11.[5] Defendants have presented no evidence that the nurses took any steps to correct the problem or alert someone that there was a problem.[6] A reasonable jury could determine from the extent of the missed prescriptions that the nurses were deliberately indifferent to the risk to Smith from not receiving his anti-rejection medications as prescribed.

2. State Law Claims

The remaining counts are state law claims for intentional infliction of emotional distress, wrongful death, and survival action. Defendants argue that each of these actions is barred by the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101 *et seq.* ("the Act"). Section 10/4-105 of the Act provides in relevant part that:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through *willful and wanton conduct*, fails to take reasonable action to summon medical care.

745 ILCS 10/4-105 (emphasis added). Defendant asserts that the definition of "willful and

---

[5] Defendants correctly note that Smith missed some of these doses for specific reasons. For example, he was in court on the morning of August 8. That may explain *why* he did not receive the missing doses, but the fact remains that the medical records show, and defendants were aware, that from August 4, 2004 until August 11, 2004, Smith was missing his prescribed anti-rejection medication more than he was receiving it.

[6] Defendants have presented no evidence that either Watson or McBride was the nurse that alerted Davis that Smith might not be receiving his anti-rejection prescriptions.

wanton" in the statute is essentially the same as the definition of "deliberate indifference" under federal constitutional law. *See* <u>Bragado v. City of Zion/Police Dept.</u>, 788 F. Supp. 366, 372 (N.D. Ill. 1992). We agree. For the reasons stated above we grant summary judgment on the state law claims to Dr. Ting. But because we have found that a genuine issue of material fact exists as to whether the remaining defendants were deliberately indifferent to Smith's medical needs, we deny summary judgment to them.

3. <u>Motion to Strike</u>

Defendants move to strike as hearsay two handwritten letters signed by Smith after he learned his diagnosis was terminal. In the letters, Smith explains his belief that he is dying and recounts how he became ill after failing to receive his anti-rejection medications while he was incarcerated in the Cook County Jail. The first letter is dated September 4, 2004, and the second November 30, 2004. Plaintiff argues that the letters are admissible under the dying declaration exception to the hearsay rule.[7]

Federal Rule of Evidence 804(b)(2) provides that in "a civil action or proceeding, a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death," is not excluded by the hearsay rule if the declarant is unavailable as a witness. In order for a statement to fall under this dying declaration exception,

> the declarant must have spoken without hope of recovery and in the shadow of impending death .... Fear or even belief that illness will end in death will not avail itself to make a dying declaration. There must be a "settled hopeless expectation" that death is near at hand, and what is said must have been

---

[7] Plaintiff also argues that defendants waived their right to contest whether the letters are appropriate evidence by waiting until after briefing on the summary judgment motions was complete. Because we are able to dispose of the summary judgment motions without relying on the letters, we need not address this argument. The question of whether the letters are admissible is bound to come up again in this litigation, so we recharacterize the motion to strike as a motion *in limine* and answer that question.

>spoken in the hush of its impending presence . . . . The patient must have spoken with the consciousness of a swift and certain doom.

Shepard v. United States, 290 U.S. 96, 99-100 (1933). *See also* Webb v. Lane, 922 F.2d 390, 395-96 (7th Cir. 1991) ("Although the declarant must believe that death is imminent at the time he makes the statement. . . .")

Plaintiff contends that "[i]t is not the temporal imminence of death which is the basis for admissibility of a dying declaration, but rather, the declarant's subjective belief in the certainty of his death, which ensures the reliability and thus the admissibility of such statements." This mischaracterizes the requirements of the rule. Plaintiff is correct only in the sense that the declarant's death is not required to invoke the dying declaration exception. If the defendant *believes* his death to be imminent, a statement that he makes concerning the circumstances of (what he believes to be) his death can later be admitted in court. This is why the rule requires only that the declarant be "unavailable" and not "deceased." But the declarant's subjective belief that his or her death is *imminent*, is required. To do away with the temporal requirement, as plaintiff would have us do, rewrites the rule. That we cannot do. The letters indicate only that Smith believed he was dying. They do not declare that he believes that death was imminent. Nor is it possible to determine such a belief from the circumstances. *See* Webb, 922 F.2d at 395-96 (allowing declarant's sense of impending death to be inferred from the seriousness of his injuries). Unless the plaintiff can demonstrate another exception to the hearsay rule, the letters must be excluded.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted with respect to Dr. Ting and denied with respect to all other defendants. Defendant's motion to strike is granted.

JAMES B. MORAN
Senior Judge, U. S. District Court

Sep. 16, 2008.